UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TERRYL M. WHITE,

                        Plaintiff,                  Case No.: 10-cv-14745
                                             Honorable Stephen J. Murphy, III
         v.                         Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 13]

Plaintiff Terryl White brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 13] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons stated below, substantial evidence supports the Administrative Law Judge's ("ALJ") finding that, although White was incapable of returning to her prior relevant work, a significant number of jobs existed in the national economy which she could perform given her age, education, vocational experience and residual functional capacity ("RFC"). Accordingly, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment be GRANTED [13], White's Motion for Summary Judgment be DENIED [12] and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     REPORT

    A.     **Procedural History**

On May 1, 2006, White filed an application for DIB, alleging disability as of May 2, 2005. (Tr. 83). The claim was denied initially on August 2, 2006. (Tr. 70-73) Thereafter, White filed a timely request for an administrative hearing, which was held on August 27, 2008 before ALJ Patricia S. McKay. (Tr. 74-75; 30-68). White, represented by attorney Peter Bundarin, testified, as did vocational expert ("VE") Lawrence Zatkin. (Tr. 30-69). On March, 16, 2009, the ALJ found White not disabled. (Tr. 9-20). On October 4, 2010, the Appeals Council denied review. (Tr. 1-5). Plaintiff filed for judicial review of the final decision on November 30, 2010. [1].

    B.     **Background**

White allegedly suffers from a number of ailments which were addressed by the ALJ's decision. However, on appeal, White seems to take issue only with the ALJ's decision as it relates to her diabetic peripheral neuropathy and, to a lesser extent, her carpal tunnel syndrome. (*See generally* Plf. Brf. at 6-12). Thus, the court will limit its recitation of White's background to information relevant to these two conditions.

    *1.     Disability Reports*

In an undated disability report, White reported her disabling conditions as diabetic peripheral neuropathy and arthritis. (Tr. 105). She stopped working as a medical transcriber in 2005, after a period of increased absenteeism precipitated by the effect of her neuropathy on her ability to operate the foot pedals associated with her transcription equipment. (*Id.*). She reported taking the following medications for her neuropathy: Lidocane patches,[1] Lyrica, and Topomax. (Tr. 111). She reported that the Lyrica did not "quite cover [her] symptoms." (*Id.*).

---

[1] Otherwise referred to as Lidoderm patches. (Tr. 174).

In a function report dated May 17, 2006, White reported that she lived with her husband in a mobile home. (Tr. 114). Her daily activities included some household chores when she felt good enough, including loading and unloading the dishwasher, laundry (but not lifting), and occasional cooking and feeding her cat and dog. (Tr. 114-116). Otherwise, she reported spending her days watching television, teaching herself Italian, reading books, magazines and news, emailing, writing letters to friends who are not computer literate, crocheting, cross-stitch and "e-political activism." (Tr. 114; 118). She also reported going out to dinner with her husband and visiting friends, as well as driving to the nail salon once every two weeks and going to the doctor. (Tr. 116-18).

White reported difficulties with lifting, squatting, standing, reaching, walking, sitting, kneeling and stair climbing. (Tr. 119). She did not report difficulties with her memory, concentration or her ability to complete tasks. (*Id.*). She reported being able to walk about 5-10 minutes before having to rest. (*Id.*). She also used a cane to walk. (Tr. 120). White reported that her pain interferes with her sleep and that sometimes it "breaks through" the combination of her Lidocane patches and Vicodin. (Tr. 115). White reported having no difficulties in her personal care. (*Id.*). However, in an undated disability appeals report, White reported having difficulty showering due to balance issues and grooming due to problems with her upper extremities. (Tr. 131). She also reported needing to sit and rest in a recliner with her feet elevated. (Tr. 132).

### 2. *Plaintiff's Testimony*

At the hearing the ALJ noted that White had her leg elevated. (Tr. 35). White testified that she was 55 years old and lived with her husband in a one story modular home. She testified that she completed two years of college and worked in medical transcription from approximately

3

1972 until her alleged onset date.  (Tr. 37-38; 40).  She stopped working at that time after her diabetic neuropathy progressively worsened to the point where she was only able to work one or two days a week due to her inability to operate the foot pedals on the machine.  (Tr. 39).

White testified that her daily activity depended on whether she had slept the night before. (Tr. 43).  If she was having a bad day, she would remain in bed all day or she would just be able to make it to the chair to watch television.  (Tr. 58).  She testified that she had two to three bad days a week.  (*Id.*).  If she was having a good day, her day consisted of getting up and making the bed.  (Tr. 43).  She would then sit and put her feet up.  (*Id*).  If White was feeling well enough she would do a load of laundry, though her husband would carry the basket if her back was bothering her.  (*Id.*).  She would email friends (though less frequently since her carpal tunnel surgery), and she would write letters to relatives, as well as read.  (*Id.*; Tr. 57).  She testified that her surgery had given her some relief for her carpal tunnel symptoms, but that recently she was having muscle spasms in her arm.  (Tr. 50).  She testified that her finger tips were slightly numb, and she had a hard time gripping things, requiring two hands to do so.  (Tr. 55).

White testified that she rarely drove, only to places within about five miles of her house, which included the drug store and the nail salon.  (Tr. 47-48).  She testified that she could walk about half a block, and stand about five minutes.  (Tr. 52-53).  She used a cane for balance, though it was not prescribed to her.  (Tr. 52).  She testified that she could sit for about an hour before she would have to get up because of her back.  (Tr. 54).  White testified that she was limited to lifting ten pounds.  (*Id.*).

When asked what specifically prevented her from working, White testified that it was "primarily" her feet, although she also had trouble with the numbness in her finger tips and pain in her back when sitting for long periods of time.  (Tr. 56).  She testified that the pain prevented

her from being able to concentrate, and her inability to sleep at night often meant she would doze off during the day. (*Id.*).

           3.       *Medical Evidence*

                a.       *Treating Sources*

                      i.       *Peripheral Neuropathy*

White submitted records regarding her condition from several treating physicians. White was treating with Dr. Gary Wozniak as her primary physician from at least as early as June 2005 until August 2007. [Tr. 221; 192] (*Id.*). At an appointment on June 15, 2005, Dr. Wozniak noted that White reported being unable to return to work because of her pain, and that she asked for "a work note for indefinitely." (Tr. 150). On September 15, 2005, Dr. Wozniak noted decreased sensory perception bilaterally in her extremities and wrote White another note for work.[2] (Tr. 142). His treatment notes from October 2005 and December 2005 reflect the same examination observations. (Tr. 139; 141). He continued to write notes for White's employer during this time. (*Id.*).

At an appointment in January 2006, Dr. Wozniak again noted decreased sensory perception bilaterally in White's feet, but did not examine her neuropathy beyond that, noting that she was "being followed by neurology" for her condition. (*Id.*). He again issued White a disability note for work. (Tr. 180). At an April 2006 appointment, White reported numbness and tingling in her feet, and Dr. Wozniak noted decreased sensory perception in both her hands and legs. (Tr. 219). At appointments on June 22, 2006, and August 27, 2006, Dr. Wozniak did not discuss White's neuropathy beyond the fact that he noted decreased sensory perception

---

[2] While his notes reflect decreased senses in her "extremities" bilaterally, later treatment notes reflect that he has limited this observation to her feet. (Tr. 179). This comports with her reports at the time that she was not experiencing neuropathy in her upper extremities. (Tr. 150; 221).

bilaterally in her extremities. (Tr. 171; 173). At two appointments in October 2006, Dr. Wozniak did not even check her extremities. (Tr. 168; 170).

At an appointment in January 2007, White reported some foot pain, and sought refills of her Vicodin and Lyrica. (Tr. 206). Dr. Wozniak noted a history of neuropathy and upon examination, documented decreased sensory perception bilaterally in her feet. (*Id.*). At a March 2007 appointment and again in June 2007, Dr. Wozniak did not mention White's neuropathy, but noted decreased sensory perception bilaterally in her extremities. (Tr. 194-195). At her final appointment with Dr. Wozniak, White reported that her neuropathy had "been under better control with the Lyrica." (Tr. 192). Upon examination he noted decreased sensory perception bilaterally in her extremities and tenderness on the bottom of her foot. (*Id.*).

After August 2007, White moved and began treating with Dr. Rick Saier as her primary physician. (Tr. 190-192). At December 2007 appointment, Dr. Saier noted White's peripheral neuropathy, and documented that she had been recommended to try a spinal cord stimulation device by Dr. Kim in the pain clinic, but that she never followed up with this.[3] (Tr. 188).

On May 5, 2005, Dr. Mary Ann McKee, a neurologist, treated White. (Tr. 221). At an appointment on May 5, 2005, White reported numbness, tingling and burning in her feet, but reported no similar sensations in her arms. (*Id.*). Upon exam, Dr. McKee found that her motor exam was 5/5 in her lower extremities bilaterally, but her reflexes in her legs were absent. (*Id.*). She had diminished pinprick sensitivity below both ankles and absent vibration sense at her left

---

[3] On July 6, 2005, White was assessed by Dr. David Kim at the Henry Ford Hospital Pain Clinic. (Tr. 147-148). Dr. Kim documented similar reports to the ones noted by Dr. Wozniak. (Tr. 147). Upon exam, Dr. Kim found White strong in both her lower extremities, but that her reflexes were diminished and she had a decreased sensation to light touch. (*Id.*). He found her gait "somewhat antalgic," but that she moved "well with a straight cane." (Tr. 148). He concluded that she should continue her current regimen, but that she should consider a "spinal cord stimulator pending above strategies." (*Id.*).

toe and diminished at her right toe (but present at the ankles).  (*Id.*).  She had difficulty with tandem walking.  (*Id.*).  At the time she was on Neurontin, but she complained that it wasn't working, so Dr. McKee added Topomax to, what she called, "a long, long list" of medications White was taking at the time.  At an appointment on August 30, 2005, Dr. McKee's notes reflect that White reported the recent addition of Topomax to her regimen had "helped her a little bit," and Dr. McKee increased the dose, hoping it would further help the burning and tingling in her feet.  (Tr. 143).  In November 2005, Dr. McKee took White off Neurontin and put her on Lyrica.  (*Id.*; Tr. 140).  On February 16, 2006, White reported that the Lyrica helped her during the day, but that she still had severe pain at night.  (Tr. 174).  Dr. McKee did not examine her at this appointment, but added Lidoderm patches to White's regimen, to help her with her night pain.  (*Id.*).  At an appointment in July 2006, Dr. McKee noted that White had "been greatly helped with the use of Lyrica" and that the Lidoderm patches were helping as well.  (Tr. 172).

Dr. McKee's treatment notes pick up six months later, in February 2007.  (Tr. 199).  In her notes, a copy of which Dr. McKee noted was to be sent to White's attorney, she found that White's neuropathy "has been very debilitating for her, in fact she is disabled from it.  She can barely function . . . ."  (*Id.*).  Upon examination Dr. McKee found that White could not tandem walk, was unbalanced when she walked and formed a wider base in order to balance.  (*Id.*).  She also noted that White had to watch her feet when she walked in order to determine where to place them.  Despite these findings, Dr. McKee noted no "acute change."  (*Id.*).  In July 2007, Dr. McKee filled out a physical capacities evaluation for White, finding that she could, at most, sit, stand or walk for one hour out of an eight-hour work day and that she needed unlimited ability to lie down and rest.  (Tr. 182).  Dr. McKee also found that White could never lift or carry even 10 pounds, that she could do no grasping, pushing, pulling or fine manipulation and that she

could not use foot controls.  (Tr. 182-83).  She further found White could never stoop, squat, crouch, crawl, climb or reach above her shoulder.  (Tr. 183).  Dr. McKee diagnosed "severe peripheral neuropathy," evidenced by an EMG and blood work,[4] and concluded that White could not return to her former work, with or without restrictions.  (Tr. 184-85).   However, at the next documented appointment, ten days later in August 2007, Dr. McKee found that White's neuropathy was "under good managed control" through medication and that "she is doing well." (Tr. 193).  Dr. McKee's examination of White revealed that she had 5/5 power in her legs proximally and distally and that, while she had diminished vibration sense in her left toe, there was no pinprick loss proximal to her ankle.  (*Id.*).  White was able to tandem walk during this appointment, although her gait was slightly antalgic.  (*Id.*)  Dr. McKee recommended that White "try to stay off her feet, particularly when her feet are very painful."  (*Id.*).

In March 2008, Dr. McKee noted her agreement with Dr. Saier's recommendation that White discontinue taking Topomax.  (Tr. 218).  Upon examination Dr. McKee noted that White ambulated well, had good power distally in her lower extremities, and had absent vibration sense below both ankles, diminished at the right ankle more than the left and present minimally at the left shin but not the right.  (*Id.*).  White's pinprick sensitivity was diminished distally toward her toe tips, but present at the bottoms and sides of her feet and up the back of her heel.  (*Id.*).

### ii.      *Carpal Tunnel Syndrome*

At an appointment in January 2006, White first reported experiencing tingling in her hands.  (Tr. 179).  She told Dr. Wozniak that she started wearing her braces again.  (*Id.*).  At an appointment in October 2006, White reported pain in both thumbs, more her right than her left. (Tr. 168).  Dr. Wozniak assessed that he could "see hand surgery."  (*Id.*).   White saw hand

---

[4] It should be noted that there is no EMG in White's record.  According to Dr. McKee's May 2005 treatment records, White reported to her that an EMG had been performed "some years ago," which diagnosed beginning peripheral neuropathy.  (Tr. 221).

surgeon Peter Janevski on November 28, 2006, and he assessed a right trigger thumb and bilateral carpal tunnel syndrome. (Tr. 167). He recommended an EMG and possible surgery. (*Id.*). An EMG performed in January 2007 revealed mild carpal tunnel syndrome in her right hand and borderline in her left. (Tr. 202-205). Dr. Janevski performed right carpal tunnel release and right trigger thumb release surgery on January 31, 2007. (Tr. 200). At post-surgical follow up appointments, Dr. Janevski noted that White's numbness had resolved and she had good motion of her digits. (Tr. 196; 198). He noted that she would also need carpal tunnel surgery on her left hand. (Tr. 196). In May 2008, White was diagnosed with a right ring trigger finger, and Dr. Janevski performed outpatient surgery to correct it. (Tr. 215-216). At a post-surgical appointment, Dr. Janevski noted that White reported her right hand was doing well after her previous right carpal tunnel release. (Tr. 214). According to Dr. Janevski's notes, he was next going to perform carpal tunnel release on White's left hand, but there are no subsequent treatment notes in the record regarding this procedure. (Tr. 214).

### b.      *Consultative and Non-Examining Sources*

On July 13, 2006, White underwent a consultative examination by Dr. Dang Vu, M.D. (Tr. 151-157). At the examination, White reported that she was unable to walk more than 30 feet or stand more than 10 minutes at a time because of increased tingling and burning in her feet. (Tr. 151). She reported being unable to cook or do any housework, but that she was able to shower and dress herself. (*Id.*). White reported that, because of back pain, she was unable to lift things heavier than ten pounds. (*Id.*). Dr. Vu noted upon exam that White had a full range of motion in her extremities and pedal pulses 2+ bilaterally. (Tr. 152-53). She was able to get up from the chair and table without assistance and her deep tendon reflexes were normal. (Tr. 153). Her sensory functions were also intact to gross testing. (*Id.*). She was unsteady after a few steps

9

while doing heel and toe walking, as well as tandem walking, but she was able to squat and stand from squatting, and her gait was slow but steady. (*Id.*; Tr. 155). Her gross and fine dexterity was intact. (*Id.*). Her hand strength was 18-kg in her right and 12-kg in her left. (*Id.*).

On August 6, 2006, Dr. Mohammad Azimi conducted a RFC assessment of White. (Tr. 158-165). Based on his review of her records, he found she was capable of occasional lifting 20 pounds and frequently 10 pounds. (Tr. 159). She could stand, walk or sit six hours of an eight-hour day, and she had unlimited ability to push or pull. (*Id.*). Dr. Azimi found White could occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 160). He placed no manipulative limitations on her. (Tr. 161).

### 4.    *Vocational Expert's Testimony*

VE Lawrence Zatkin testified in response to hypothetical questions from the ALJ and White's counsel. The ALJ posed a hypothetical to the VE involving a claimant of White's age, education level and past vocational history, with the additional restrictions of: sedentary work, only occasional climbing, balancing, kneeling, crouching, stooping and crawling, and avoiding concentrated exposure to dust and fumes. The VE testified that such limitations would prevent such a claimant from returning to her prior relevant work, but that such a claimant could perform a number of jobs in the national economy that used similar skills, including billing clerk, receivable clerk, payable clerk or data input clerk. (Tr. 64-65). When asked how a sit/stand option affected such a claimant's ability to do these jobs, the VE testified that the need for such an option would preclude all work that included transferrable skills. (Tr. 62-64). When asked what role a limited sensation in one's fingertips would play in affecting these jobs, the VE testified that it depended on how significant the effect of the loss of sensation was. (Tr. 65). The VE testified that if loss of sensation meant that the person could not perform work tasks for at

least one-third of the work day, it would preclude the claimant from these jobs.  (*Id.*).  The VE

further testified, in response to a question from the ALJ about the need to elevate one's feet

while working, that elevation 90 degrees or below, or regularly at "foot stool height," which

means 45 degrees for both legs, would still permit a claimant to perform the work.  (Tr. 66).

However, any need to elevate the legs above 90 degrees (more than parallel to the floor) would

prevent a claimant from performing this work.  (*Id.*).  Finally, the ALJ asked the VE what

White's ability to work would be if the ALJ took all of her testimony as credible.  The VE

responded that because White testified that her conditions would cause her to be incapacitated

two to three days a week, this level of absenteeism would prevent her from performing any of the

jobs the VE identified.  (Tr. 66-67).

### C.     Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the

severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.     The ALJ's Findings**

The ALJ, following the five step sequential analysis, determined that White was not disabled.  At Step One, she found that White had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 14).  At Step Two, the ALJ found that White suffered from the following severe impairments: diabetes mellitus with peripheral neuropathy, carpal tunnel syndrome and asthma.  (*Id.*).  At Step Three, the ALJ determined that White's impairments, alone or in combination, did not meet or medically equal a listed impairment.  (Tr. 15).  The ALJ then assessed White's RFC.  (Tr. 15-18).  She found White was capable of performing "sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: avoid concentrated exposure to dust and fumes."  (Tr. 15).  At Step Four, she determined that White was unable to return to her prior relevant work because of the need to use foot pedals in that work, which she was incapable of doing because of her neuropathy.  (Tr. 18-19).  At Step Five,

12

the ALJ concluded that, based on White's age, education, vocational experience and RFC, she had acquired work skills that were transferrable to other occupations existing in significant numbers in the national economy, based in part on the testimony of the VE  (Tr. 19-20).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499

13

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

The court "may look to any evidence in the record, regardless of whether it has been cited by the

Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement that either the ALJ

or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r*

*of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence

without directly addressing in his written decision every piece of evidence submitted by a

party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial

evidence, "it must be affirmed even if the reviewing court would decide the matter differently

and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of*

*Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.     Analysis

White argues that the ALJ misapplied the treating physician standard and failed to give

good reasons for disregarding the treating opinions of Drs. McKee and Wozniak, specifically

their opinions about her decreased sensations bilaterally, and Dr. McKee's functional capacity

assessment which found White unable to return to her past work.  White also takes issue with the

ALJ's determination of her credibility.  Finally, White argues that the ALJ's hypotheticals to the

VE were inadequate because they did not account for all of her limitations.

### 1.     Treating Source Opinions

White argues that the ALJ failed to give good reason for adopting the consulting opinion

of Dr. Vu over the treating records of Drs. McKee and Wozniak, and for rejecting Dr. McKee's

functional limitations form and Dr. Wozniak's notes excusing White from work based on

"disability".

14

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.

Here, the ALJ evaluated with specificity the treatment records of Drs. McKee and Wozniak and found them consistent with the RFC she ultimately assessed.  (Tr. 16).  She noted that Dr. Wozniak was a family practitioner, not a specialist.  (*Id.*).  With regard all of her doctors' opinions, the ALJ found that that while they noted decreased reflexes and sensations, as well as a somewhat antalgic gait, they also noted that White moved well with a cane, had 5/5 strength proximally and distally, and maintained pinprick sensation at the sides and bottom of her feet as well as up the back of her heel.  (*Id.*).  The ALJ noted that Dr. McKee's treatment records reflect that White's neuropathy was under good control with medication.  (*Id.*).

However, with regard to Dr. McKee's disability report, the ALJ found the restrictions placed on White inconsistent with the other medical evidence in the record.  (Tr. 18).  In

15

addition, the ALJ characterized the form, as well as Dr. Wozniak's work notes, as dealing with White's ability to return to her former employment, and thus found them consistent with her own determination that White could not return to her former job.[5]  (*Id.*).

Despite White's contention, it is clear from the ALJ's decision that she did consider and give significant weight to the majority of Dr. McKee's opinions.  Substantial evidence supports this decision, as Dr. McKee's treating records consistently showed improvement in White's condition through the use of Lyrica and Lidoderm patches, to the point where Dr. McKee found White could "ambulate well" and considered taking her off Topomax.  (Tr. 218).  The only record reporting contrary findings was the one Dr. McKee noted was being submitted to White's attorney, and her disability report, both of which were assessed prior to a number of treatments noting continued progress in White's condition.  (Tr. 181-85; 199).  In addition, Dr. McKee's disability report imposed greater restrictions on White than those she, herself, testified to having.  For example, McKee limited White to no lifting, not even up to ten pounds, whereas White testified to not being able to lift more than ten pounds.  (Tr. 54; 182).  Furthermore, Dr. McKee found that, based on White's peripheral neuropathy, she could not sit more than one hour in an eight-hour day.  (Tr. 181).  However, at the hearing, White testified that she could not sit more than one hour at a time due to her back, not her legs.  (Tr. 54).  On this record, the court finds that substantial evidence supports the weight the ALJ gave to White's treating doctors' opinions.

### 2. White's Credibility

White also challenges the ALJ's assessment of her credibility, specifically regarding her level of pain and the effect of her medications.  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her

---

[5] The form itself asked whether the patient was capable of returning, with or without restrictions, to any of his or her former employment positions.

credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Here, the ALJ recognized the requirements imposed upon her by the regulations, and found that while White's conditions could reasonably be expected to produce her pain and other symptoms, her statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment. (Tr. 15-16). The ALJ found that the medical evidence failed to document "an impairment that would account for the substantial pain, fatigue and other difficulties" that White alleged in her report and at the hearing. (Tr. 16). The ALJ described in her opinion the medical evidence for all of White's conditions and found it inconsistent with her allegations. (Tr. 16-17).

Specifically regarding her carpal tunnel syndrome, the ALJ noted that Dr. Janevski had reported that White's right hand had much improved after surgery, and that while she testified that she had continued pain in her left after the same surgery, there was no medical documentation to support that. (Tr. 17). The ALJ also found White's daily activities of laundry, letter writing, email, and periodic driving, among other things, inconsistent with her allegations of disabling pain. (Tr. 17). Specifically regarding her neuropathy, the ALJ noted that her

17

condition had become well-managed by the medication and this is fully documented in the treatment records of her physicians, which show an increased ability in ambulation and a reduction in the number of medications she was taking.

Finally, there is no evidence to support White's claim that she is overly fatigued by pain or her medications to the point where she cannot concentrate. There is no indication in any of her treating physicians' notes regarding complaints of fatigue. If anything, Dr. Saier found that White's sleeping was irregular because she would stay up until 2 or 4 in the morning with her husband and then not wake until 2 the next afternoon. (Tr. 217). Furthermore, White reported being able to concentrate for "a long time" on something if the subject matter was "interesting." (Tr. 119). This is borne out by her ability to "read like a fiend," watch television, play computer games and write letters. (Tr. 118). Based upon the ALJ's close inspection of the record, and her ability to assess White's demeanor at the hearing, the court finds substantial evidence supports the ALJ's determination of White's credibility.

### 3. The ALJ's Hypothetical Questions

Finally, White argues that the ALJ's hypothetical questions to the VE were insufficient because they did not account for all of her limitations, specifically the limitations Dr. McKee found and the limitations to which White testified at the hearing. (Plf. Brf. at 11-12). An ALJ is entitled to rely upon the testimony of a VE in response to hypothetical questions to the extent those questions accurately portray the claimant's physical and mental impairments. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). It should be noted, however, that an ALJ is only required to pose those hypothetical limitations that she finds credible. *Burbo v. Comm'r of Soc. Sec.*, No. 10-2016, 2011 U.S. App. LEXIS 26143 (6th Cir. Sept. 21, 2011) *citing Stanly v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir.

18

1994).   To the extent that White argues that severe limitations involving her hands or the limitations that Dr. McKee imposed upon her should have been included in the hypothetical questions, the court has already addressed those claims above, finding that the ALJ's determination that those limitations were not credible was supported by substantial evidence.

To the extent that White argues that the ALJ should have credited the VE's testimony regarding the lack of jobs available with a sit/stand option, the ALJ properly assessed that her inclusion of this limitation in the hypotheticals was only relevant where the questions involved light work, and disappeared when she changed the category to sedentary.  (Tr. 64).  The court does not find error in this determination, as White claimed that her need to stand was due to her back, not to her neuropathy, (Tr. 65), and the ALJ did not find a severe impairment in relation to White's alleged back pain, (Tr. 14-15), a determination White does not appeal.

Therefore, because the hypotheticals the ALJ posed to the VE included all of White's credible limitations, the VE's testimony was sufficient and the ALJ was entitled to rely upon it. Hence, substantial evidence supports the ALJ's determination that White was not disabled.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be GRANTED, White's Motion for Summary Judgment [12] be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.


Dated: February 23, 2012                       s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 23, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

20